Komitee, J
Levy, MJ

RECEIVED IN PRO SE OFFICE

NOV 14 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Joshua Adam Schulte,

Plaintiff,

–v–

New Civil Rights Complaint

United States of America, and
Unknown Other Defendants,

Defendants.

Plaintiff Joshua Adam Schulte alleges as follows:

## I. NATURE OF ACTION

1. Defendants, the United States of America, and its constituent part, the Federal Bureau of Prisons ("BOP"), and individuals unknown, owe a duty of care to the inmates housed in its facilities. That duty requires the government to meet detained peoples' basic needs, including heat, the conditions required for sleep, adequate food, access to recreation, access to a toilet, and confinement free from torture and permanent harm, among others. Defendants also must provide medical care and treatment to those suffering serious medical emergencies. The Defendants repeatedly failed to meet its basic obligations to Mr. Schulte, Plaintiff, during his confinement at the Metropolitan Detention Center (MDC) in Brooklyn, New York.

## II. JURISDICTION AND VENUE

2. This is a civil action seeking monetary relief for the negligence of the United States and its constituent part and instrumentality, the BOP, pursuant to 28 U.S.C. § 2674, and against individuals pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971). The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1346(b)(1) and Bivens.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2), 1402(b), as the events giving rise to this action occurred at the MDC in Brooklyn, New York, located within the Eastern District of New York.

## III. PARTIES

4. Plaintiff, Joshua Adam Schulte, was detained in unit K-84 at the MDC from October 2021 to present, after the Metropolitan Correctional Center was shuttered.

5. Defendants include the United States of America, and its constituent part and instrumentality, the BOP, as well as ~~other members of the administration~~ ~~the United States with uknown names that Government has concealed~~ other unknown individuals whose names have thus far been concealed; Defendants were responsible for Mr. Schulte while detained at the MDC.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Mr. Schulte has exhausted all available administrative remedies at least four separate times for all issues herein prior to filing this civil complaint. The BOP blocked Mr. Schulte from the necessary forms or otherwise engaged in bad faith to block all his efforts to complete exhaustion. Moreover, Mr. Schulte filed numerous separate Federal Tort Claims Act ("FTCA") notices. Accordingly, Mr. Schulte now seeks redress through the courts.

## I. STATEMENT OF FACTS

7. On or about October 2021, the BOP moved Mr. Schulte from the shuttered MCC and placed him in the MDC's most restrictive housing unit, K-84, pursuant to the Department of Justice's ~~restrictive~~ Special Administrative Measures ("SAMs") designation. This designation was never imposed with proper due process required by the Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995) and Wilkinson v. Dustin, 545 U.S. 209 (2005).

### A. The Brooklyn Concentration Camp

8. The conditions of confinement imposed against Mr. Schulte were worse than those in Sandin, Wilkinson, and any other convicted person in the entire United States — worse even than those imposed on death row inmates around the country — ~~including~~ even worse than conditions declared unconstitutional by numerous courts of appeal.

9. The imposition of these tortures were not based upon his SAMs for national security, but SAMs related to those who pose a serious risk of violence (which he was not imposed) as well as additional tortures.

10. The United States Federal Government hates Mr. Schulte and sought to murder him by torturing him until he killed himself or finally succumbed to insanity.

11. Joshua Adam Schulte is locked in a small concrete and steel cage 24 hours per day, 7 days per week. During the weekdays he is sometimes permitted to spend one hour either in the shower-sized "law library" containing a discovery review and law review computer or recreation, else he is locked, not in an "open-faced cell" allowing "easy communications" like those in the Ohio State Penitentiary Supermax in Wilkinson, but a fully closed steel door with no window ~~to see~~ from AND 24/7 speakers blasting continuous noise in his torture cage. Whereas OSP inmates had ~~weekly~~ daily recreation with others and "access to basketball courts and work-out areas," Mr. Schulte's recreation,

4

If he gets it, is solitary and without a basketball goal, balls, or anything at all except to walk the square. Whereas DSP inmates had access to books, programming, religious services, and some congregate programming, Mr. Schulte has none of those things — no access to the institution's library, institution programming, religious services — nothing. Mr. Schulte has no access to board games, playing cards, television, radio, Mp3 players, tablets, or educational activities like college courses — all of which provided to general population; Mr. Schulte has no access to email like general population or 300 phone minutes like general population or in-person physical contact; he cannot even send mail; he cannot work to pass the time, has no access ~~snacks, foods, or any access~~ to general population commissary like snacks, foods, electronics, clothing, or puzzles; Mr. Schulte has no access to hot water, but only cold showers; no access to religious services like books, teachers, ceremonies, etc. The torture cages are blasted 24/7 with the extreme cold and no heat during the winter; the food is significantly less and insufficient to quell Mr. Schulte's hunger pangs; all light switches were removed from the torture cages and bright lights prevent sleep 24/7; there is no desk chair as permitted in general population; limited clothing, sheets, blankets, and cleaning supplies; no lockers for property storage; Mr. Schulte is subjected to 24/7 monitoring, must be handcuffed, belly-chained, and accompanied by 4 officers during movement to RID. Unit team never makes rounds — Mr. Schulte is essentially locked in a cage and the government throws away the ~~any~~ key — there is no worse torture that has ever been envisioned by man.

12. In the concentration camp, no activities are permitted. The MDC has a surplus of over 200 unused televisions in the shuttered East building, but refuses to put one in Mr. Schulte's cell. The MDC has a library, but prohibits Mr. Schulte from accessing it. The MDC has radios, mp3 players,

and tablets in commissary, but refuses Mr. Schulte from purchasing them. The MDC has various puzzle books, but refuses Mr. Schulte from purchasing them. The MDC hires prisoners to do all its work as slave labor, but this would-be-delightful slavery is not available to Mr. Schulte. Mr. Schulte can't attend religious services, engage in education services to take college classes, or communicate with anyone. The MDC has email services, but refuses to provide it to Mr. Schulte. Mr. Schulte can't even have a pen pal to mail. So, what, exactly, is available for Mr. Schulte to do in the 24 hours per day, 7 days per week? Twiddle his thumbs. Eat what little food is offered him. Void his bowels. And sleep (or attempt to do so). His only daily activity is to twiddle his thumbs — a monumental departure from the typical prison environment. Mr. Schulte is the very embodiment of the provisional existence Victor Frankle described as his concentration camp experience in "Man's Search for Meaning." The gas chamber would be a welcome improvement at the MDC concentration camp.

13. There is no prisoner in the entire United States possibly the entire Western Hemisphere, who suffers worse confinement conditions than Mr. Schulte. There is no case described before the Supreme Court, courts of appeals, or district courts in the modern era where any prisoner is tortured worse than Mr. Schulte. According to the Liman Ctr. for Pub. Int. L. at Yale Law School's Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell (2018), only 5.7% of prisoners have been confined to solitary 6 years or more like Mr. Schulte, of those in solitary only 4% had no in-cell programming like Mr. Schulte, 3% had no access to TV, music, internet or the institution's library, 66% had no access to tablets, and 0% had the combination of all including severe restrictions on communication including intra-prison, mail, and social.

B. Exposure to the extreme cold

14. The MDC provides heat to the attorney-client visiting room and the "law library", but blasts the air conditioner in the torture cages all winter long. Sometimes even the unit itself is not heated — and corrections officers wear winter and ski gear while Mr. Schulte and his fellow slaves freeze.

15. Mr. Schulte frequently wore all his permitted clothing — 2x boxers, shirt, socks, thermals, 1x sweats — and his blanket to try and stay warm. It is regularly too cold to expose his hands to outside air, and his appendages and face natively freeze numb. He once had a ski hat to cover his head and ears, but when the MDC discovered it helping to keep him warm, they seized it; Mr. Schulte regularly wears a towel or sheet wrapped around his face and ears to try and keep warm.

16. Mr. Schulte regularly alerted unknown corrections officers, the unit manager, executive staff, and the warden about these conditions both directly in person and in writing — none ever fixed the problem.

17. As a direct result of this torture, Mr. Schulte was frequently ill in the winter, often rendered catatonic, was exposed to significant hardship and serious medical jeopardy, and other significant side effects.

C. Sleep deprivation

18. At all times, the torture lights were illuminated 24 hours per day. These bright lights filled the entire torture cage and were sufficiently easy to read from on the other side of the cage. The brightness of the light prevented Mr. Schulte's ability to sleep.

19. The "window" on the cage door had a "slot" on the outside that could close and lock over the window. The closing, locking, and unlocking of this slot was very loud inside the torture cage.

Every 30 minutes during the night, the officer would loudly unlock the slot, slam it open against the door, shine a flashlight inside (which was unnecessary due to the 24/7 lights, or rather, rendered the 24/7 lights unnecessary), slammed the slot closed, then imitated the bolt lock on the slot. In essence this amounted to a flashbang every half hour — a loud bang and flash of light — that startled Mr. Schulte awake. Sometimes this would happen twice in rapid succession as it was performed on both doors to the cage.

20. Mr. Schulte frequently tossed and turned all night, tensing in expectation of the grenade flashbang, relaxing for a few minutes, then tensing in expectation again.

21. Due to this extreme loss of sleep, Mr. Schulte experienced insomnia, night terrors, intense migraines, anxiety, depression, lethargy during the day, the inability to concentrate, and other significant side effects.

D. Deprivation of sufficient daily sustenance

22. The MDC regularly did not provide three meals per day, provided wrong meals, and provided substantially reduced portions relative to general population — including regularly without "extras" (defined as non-entree supplements) such as fruit, entire side "dishes" like corn, entire "dressing options" like cheese, lettuce, and bread, and without condiments like salt, pepper, and ketchup.

23. While the MDC eventually did begin providing 3 meals, the other issues persisted — kosher, halal, no flesh and allergic meals provided to the wrong inmate so none could eat, trays served in small styrofoam containers with far less volume than the hard plastic trays

provided to general population, and more or less insufficient meals, and no option to supplement as allowed general population.

24. Additionally, the MDC often served meals either too close together or too far apart to essentially qualify as a single meal.

25. Mr. Schulte suffered greatly from starvation. He lost 50 lbs from 175 to 125 (though BOP records only show a loss of half that, 155 to 125), suffered malnutrition, and ~~was regularly suffe.~~ regularly suffered intense hunger pangs, particularly throughout the night. Mr. Schulte regularly drank excessive water in an attempt to quell his persistent hunger.

E. Deprivation of exercise and access to toilet

26. The MDC was required to provide access to the law library and recreation each day during the weekdays for an hour each, but rarely did so. Due to the MDC's own arbitrary policy that only a lieutenant could have the keys to the torture cages, and required at least three to move, they often simply refused law library & recreation or only took one person per day and left that individual all day.

27. As a result, Mr. Schulte regularly did not receive his 1-hour per day recreation and fell well short of his 5 hours per week — often receiving zero hours or one. (Excess one day did not compensate for none the other days)

28. Similarly, when Mr. Schulte did get out to recreation or law library as punishment he could not leave for many hours — sometimes as long as 12 hours spent locked in the shower-size law library or recreation yard. Mr. Schulte was often compelled to urinate and defecate on the floor in the law library or outside like an animal. He would then be forced to clean up his own ~~exc~~ bodily excretions.

29. Mr. Schulte has a pre-existing heart issue that can be mitigated by consistent exercise. When he was unable to exercise, Mr. Schulte experienced increasingly frequent and acute heart palpitations and migraines. Mr. Schulte also continued to experience muscle atrophy and persistent aches and pains when unable to exercise as well as increased anxiety and depression. Moreover, the trauma associated with recreation — namely, the potential inability to return or use the toilet for 8-12 hours — often increased anxiety and other health issues.

30. Mr. Schulte experienced significant health problems from the lack of exercise and from being forced to hold his bodily excretions as well as from being unable to do so and forced to do so without a toilet, i.e. on the floor or outside like a dog; Some of these include extreme pain from intestines and internal organs, constipation, frequent urination and diarrhea, bloody stools, and dehydration — particularly during the summer months.

F. Deliberate indifference and negligence of psychological services

31. As will be discussed in further detail in the next section, Mr. Schulte was tortured in indefinite solitary confinement for 6 years and suffered significant and permanent damage that will result in a statistically high risk of premature mortality and loss of at least 15-20 years of life expectancy. Mr. Schulte experienced significant symptoms of the "SHU Syndrome" that were flagrantly, negligently, and illegally disregarded by MDC Psychological services; some of these symptoms include anxiety, depression, insomnia, paranoia, hypersensitivity, obsessive thoughts, cognitive disturbances,

hypertension; heart palpatations, deterioration of eyesight, hallucinations, ~~panic~~ panic attacks, heart arrythmias, mania, self-harm, and suicidal ideation

32. Psychological services ignored these symptoms and did not treat Mr. Schulte or alert prison officials to his degraded health.

33. Moreover, there were three significant incidents involving MDC's chief of psychology and two other psychologists which demonstrate their deliberate indifference.

34. ~~During~~ On or about September-October 2022, Mr. Schulte experienced a traumatic mental health crisis precipitated by his torture in which he was placed on suicide watch. Mr. Schulte's conditions on suicide watch only exasperated his problems — although this crisis was brought about by 6 years of indefinite solitary confinement and tortures at MDC's concentration camp, (and not) some of which are described herein, the Psychology Department determined to increase his torture ten-fold as "treatment": he was moved to the abandoned suicide watch in the other building; into a smaller cage with brighter constant lights; even less food; increased cold because his clothing was confiscated and he was made to wear a light velcro smock that extended from the ~~bare~~ neck to the genitals; no access to hygiene like toothbrush, toothpaste, showers, or soap; no running water; no utensils to eat his food with; ~~they brought wrong medicatio~~ they tried to force him to consume the wrong medication; he had no access to recreation or "law library" and could not contact his attorney. Somehow this ten-fold increase of Mr. Schulte's torture was to resolve the mental health crisis.

35. During Mr. Schulte's ten-fold increase in torture on "suicide watch" which is more aptly "suicide wait" as such conditions are guaranteed to cause suicide, the psychologists made it known to him that these tortures were imposed as punishment for seeking psychological

help. Once per day, the psychologist would come by and first ask "How are you liking suicide watch?" "Oh, you don't like it? Well, what have we learned?" It was clear that psychology did not want to deal with psychology issues, and so used negative reinforcement to loudly proclaim that "if you were thinking of suicide, you should not talk to anyone about it but just kill yourself and be done with it." Mr. Schulte learned his lesson— after informed that he would be released after 3 consecutive days of saying he did not want to self-harm, he did so and was released.

36. Some weeks after release from suicide wait, a psychologist banged on his door early one morning screaming at him to pack out back to suicide wait. Panicked beyond reason, Mr. Schulte refused and prepared to fight to the death to avoid being brought back to the hell beyond hell. After several tense minutes, the angry, screaming, adversarial psychologist began waiving same letter that Mr. Schulte had written, saying that unless he hadn't written the letter they would drag him kicking and screaming back. So Mr. Schulte denied writing the letter. The psychologist then began asking leading questions about the letter, such as, "You didn't mean these words, did you?" "No." "You were just trying to get attention, right?" "Right." "You don't want to harm yourself, do you?" "No." "You are not going to kill yourself, are you?" "No." So, Mr. Schulte was spared hell's hell, but the psychology department wrote Mr. Schulte's judge to alert him that Mr. Schulte was just trying to get attention and was not serious about his letter. See U.S. v. Schulte, 17 CR 548 (SMB).

37. Next on or about February-March 2023, the same psychologist confronted Mr. Schulte about yet another letter. ~~This time of~~ This time the psychologist was far less adversarial, but nonetheless

threatened Mr. Schulte with suicide wait. After learning from the lessons taught by MDC negative reinforcement psychology, Mr. Schulte promptly denied writing any such letter. The psychologist reinforced this behavior saying "that's good," "now my boss, ~~it too~~ is coming so tell her the same thing or you will go to suicide watch." The head of psychology then arrived with several letters. ~~She would have had this or order her~~ She provided Mr. Schulte a letter and asked if he wrote it, to which he denied. She showed Mr. Schulte his own signature and asked again, which he denied again. Finally she showed Mr. Schulte the previous letter he had written (which he had first acknowledged prior to denying and falsely claiming it was written to get attention while under duress) and compared the equal handwriting, which Mr. Schulte again denied writing. Mr. Schulte was not sent to suicide wait.

38. The MDC Psychology Department engaged in malpractices, negligence, and deliberate indifference to Mr. Schulte's serious psychological and mental degeneration. They sought to CYA first and foremost and never once engaged Mr. Schulte as he had first requested to help him. Instead of assistance, the MDC Psychologist Defendants engaged Mr. Schulte in a hostile, adversarial nature — accusative, shaming, hurtful. ~~To co~~ Instead of assisting Mr. Schulte, they sought to discourage him from speaking his issues, from needed treatment, and instead encouraged him to keep his problems to himself and just kill himself instead of seeking treatment or raising the issue so that he ~~would kill~~ himself in silence so they would not be liable

G. Torture through indefinite solitary Confinement

39. As previously noted, the United States Federal Government decided to torture Mr. Schulte because they wanted him to kill himself or suffer psychosis since he is a political prisoner falsely accused and falsely convicted of crimes against the government itself. The United States Government knew perfectly well the plethora of scientific research indicating that indefinite solitary confinement is a form of torture that inevitably causes death, but chose to impose this torture precisely because it kills.

40. The consequences of indefinite torture through solitary Confinement have confirmed that ~~these some~~ every study ~~where~~ of non-voluntary solitary longer than 10 days has ~~not~~ resulted in negative psychological effects. And in fact, even a few days of solitary will predictably shift the EEG pattern toward abnormal patterns characteristic of stupor and delirium.

41. As a direct result of torture through indefinite solitary confinement, Mr. Schulte has a serious risk of mortality and loss of life expectancy. Mr. Schulte is 80% more likely to die from suicide within his first year of release; 15 times likelier to die within 5 years of release compared to those never ~~incarcerated~~ in solitary; 127% more likely to die of an opioid overdose in the first two weeks after release; he has a high likelihood of alcohol and substance abuse, reduced electrical activity and neuron growth in the brain, decreased connections between neurons, and fewer blood vessels in the brain; his congenital heart defect is exacerbated, and he has lost 15-20 years of life expectancy as well as an inability to work in the future. Mr. Schulte will never ~~not~~ recover from his tortures in New York City's very own concentration camp.

14

## H. Government Notification

42. Mr. Schulte notified the government of all these issues multiple times through administrative remedies, Standard Form 95 submissions, and even through civil litigation. Mr. Schulte filed a Petition for Writ of Habeas Corpus to seek an end to the torture in early 2022, but the government chose to do nothing.

43. The BOP and individual defendants' negligent acts and omissions were not discretionary decisions about prison policy, and instead represent and unlawful disregard for the health and well-being of Mr. Schulte which resulted in both physical and emotional injury. Indeed, even the government's decision to implement indefinite solitary confinement cannot possibly be discretionary considering courts have found the practice unconstitutional, its implementers not shielded by immunity, and psychologists have published limitless papers on its deleterious effects and substantial risk to permanent bodily injury or death; no prison policy, regulation, or law directed the MDC to torture Mr. Schulte.

## VI. DAMAGES, LOSSES, AND INJURIES

44. Mr. Schulte suffered physical and emotional injuries resulting from Defendants' negligence, deliberate indifference, malpractice, abuse of process, and other abuses.

45. The United States Government despised Mr. Schulte, a political prisoner, so much so it sought to murder him; The United States Government sent Mr. Schulte to a concentration camp where it tortured him worse than any other individual in the western hemisphere, seeking to drive him to suicide or psychosis and permanent mental illness & for alleged crimes constituting unlawful speech.

46. Some of the torture Mr. Schulte endured was sleep deprivation through constant banging and 24/7 lighting, exposure to the extreme cold throughout the winter without heat, 24/7 starvation through missed meals and inadequate sustenance, denied physical exercise or access to a toilet, torture from psychological services in lieu of treatment and care, and of course, 24/7 indefinite solitary confinement with no human contact, 24/7 blasting torture speakers, no access to programming, services, library, a television, or any way to spend his time except twiddling thumbs — this was no rehabilitation or even an attempt to masquerade as one — it was pure hell, incomprehensible torture beyond the cruelest tortures known to man — the provisional existence and equivalent experiences under Nazi concentration camps from which the United States Government developed this torture — And one in which every rational man would want to die because man is not meant to live in such a manner — which is not living but 24/7 pain and suffering.

47. Some of the injuries suffered by Mr. Schulte include suffering extreme cold and physical sicknesses and weaknesses that accompany it; sleep deprivation and the physical tolls upon the body including insomnia, anxiety, lethargy, migraines, and exhaustion; starvation and the consequences thereof such as extreme weight loss, hunger pangs, physical weakness and pain; inability to exercise leading to an exacerbation of preexisting heart defects, muscle atrophy, heart palpatations and difficulty breathing, increase in migraines, intestinal pain and blockages from attempting to hold waste when without a toilet, constipation, frequent urination and diarrhea, bloody stools, and dehydration; the effects of long-term torture and the medical malpractice and deliberate indifference to those problems — anxiety, depression, insomnia, paranoia, hypersensitivity, obsessive thoughts, cognitive disturbances, hypertension, heart palpatations, deterioration of eyesight, hallucinations, panic attacks, heart arrythmia, mania, self-harm, and suicidal ideation; Mr. Schulte suffered permanent brain damage including reduced electrical activity, neuron growth, connections between neurons and gray matter. 15-20

48. Mr. Schulte suffers increased mortality and a loss of 12 years of life expectancy due to his torture. He will not be able to work once released, will be subject to PTSD and significantly increased risk of alcohol and drug addiction, and will never be a full human being again.

49. Torture is anathema in a civilized society. As a direct result of his torture, Mr. Schulte seeks damages from the physical and emotional injuries caused by the Defendants including loss of income, life expectancy, and punitive damages necessary to adequately compensate Mr. Schulte for the unconscionable torture by Defendants.

## VII CAUSES OF ACTION

50. Mr. Schulte hereby realleges and incorporates by reference paragraphs 1-49 for each cause.

## A. Federal Tort Claims Act (FTCA)

51. Mr. Schulte is entitled to damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), consistent with the Act's provision that a person has a remedy under the FTCA when a federal actor breaches the duty of care established by a private tort law analogue in the jurisdiction where the wrong occurred. In this case, New York State law provides a remedy for a person in private analogue for the tort claims alleged under the FTCA.

## 1. FIRST: Damages for negligent exposure to extreme cold

52. Mr. Schulte was forced to endure entire winter seasons without working heat.

53. Mr. Schulte notified the corrections officers, Unit Manager Bullock, executive staff, and the warden both in writing and in person; hence, the BOP was aware of these conditions.

54. The BOP had a duty to exercise ordinary care to Mr. Schulte.

55. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions. The failure to mitigate this excessive risk to health and safety was the result of the BOP's negligent acts and omissions and demonstrated a complete disregard for Mr. Schulte's basic human needs.

56. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

57. BOP employees were acting within the scope of their employment

58. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

2. SECOND: Damages for negligent deprivation of sleep

59. The BOP negligently caused Mr. Schulte to endure extended periods of time with only 1-2 hours of sleep each night due to 24/7 bright lights and flashbangs every half hour.

60. Mr. Schulte notified the corrections officers, unit manager Bullock, executive staff, and the warden both in writing and in person; hence, the BOP was aware of these conditions.

61. The BOP had a duty to exercise ordinary care to Mr. Schulte.

62. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions. The failure to mitigate this excessive risk to health and safety was the result of the BOP's negligent acts and omissions and demonstrated a complete disregard for Mr. Schulte's basic human needs.

63. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

64. BOP employees were acting within the scope of their employment.

65. A private employer would otherwise be liable for the negligence of Defendants. The United States is therefore liable for tort claims under the FTCA.

3. THIRD: Damages for negligent deprivation of adequate ~~sustenance~~ sustenance

66. The BOP negligently deprived Mr. Schulte of meals with adequate ~~sustenance~~ sustenance.

67. Mr. Schulte notified corrections officers, unit manager Bullock, executive staff, and the warden both in writing and in person; hence, the

BOP was aware of these conditions.

67. The BOP had a duty to exercise ordinary care to Mr. Schulte.

68. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions. The failure to mitigate this excessive risk to health and safety was the result of the BOP's negligent acts and omissions and demonstrated a complete disregard for Mr. Schulte's basic human needs.

70. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

71. The BOP employees were acting within the scope of their employment.

72. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

## 4. FOURTH: Damages for negligent deprivation of exercise

73. Mr. Schulte was prohibited from engaging in any outdoor recreation or otherwise significantly reduced weekly opportunities. As a result, Mr. Schulte was deprived of access to adequate exercise, and involuntarily forced into inactivity.

74. Mr. Schulte notified corrections officers, unit manager Bullock, executive staff, and the warden both in writing and in person; hence the BOP was aware of these conditions.

75. The BOP had a duty to exercise ordinary care to Mr. Schulte.

76. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane living conditions and physical harm to Mr. Schulte.

77. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

78. The BOP employees were acting within the scope of their employment.

79. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

5. FIFTH: Damages for negligent deprivation of toilet

80. Mr. Schulte was often prohibited from access to a toilet when locked into the law library or recreation cage.

81. Mr. Schulte notified corrections officers, unit manager Bullock, executive staff, and the warden both in writing and in person; hence, the BOP was aware of these conditions.

82. The BOP had a duty to exercise ordinary care to Mr. Schulte.

83. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane living conditions and physical harm to Mr. Schulte.

84. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

85. The BOP employees were acting within the scope of their employment.

86. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA

6. SIXTH: Damages for negligent exposure to indefinite solitary confinement

87. Mr. Schulte was tortured in a concentration camp, subject to the worse conditions of any other individual in the western hemisphere, and exposed to indefinite solitary confinement.

88. Corrections officers, Unit Manager Bullock, executive staff, and the warden were aware of these conditions.

89. The BOP had a duty to exercise ordinary care to Mr. Schulte.

90. The BOP repeatedly and enduringly failed to uphold this

duty to Mr. Schulte, resulting in inhumane and dangerous living conditions. The failure to mitigate this excessive risk to health and safety was the result of the BOP's negligent acts and omissions and demonstrates a complete disregard for Mr. Schulte's basic human needs.

91. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

92. The BOP employees were acting within the scope of their employment.

93. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

7. SEVENTH: Damages for Medical Malpractice or Negligence

94. Mr. Schulte suffered sufficiently serious medical conditions as a result of his torture, and MDC Psychology officers were deliberately indifferent to these serious medical needs.

95. MDC Psychology services, including numerous psychologists were aware of Mr. Schulte's torture and serious medical needs.

96. The BOP had a duty to provide Mr. Schulte with reasonable and adequate medical care, ~~including appropriate~~

97. The BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous untreated medical needs. The failure to mitigate this excessive risk to health and safety was the result of the BOP's ~~malpractice or~~ negligent acts or omissions and demonstrates a complete disregard for Mr. Schulte's basic human needs.

98. The BOP's actions represent an impermissible deviation from the actions of a reasonable individual in similar circumstances.

99. The BOP employees were acting within the scope of their employment.

100. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

22

8: Eighth: Damages for abuse of process to cause death or serious injury

101. The Defendant employed a regularly issued legal process, the institution of limited segregation, with intent to do harm and cause death or serious injury through long-term, indefinite solitary confinement without excuse or legitimate justification, and in order to obtain collateral objectives outside the legitimate ends of the process – to torture Mr. Schulte through long-term solitary confinement and to induce suicide, psychosis, or other serious injury.

9. Ninth: Damages for intentional infliction of emotional distress and negligent infliction of emotional distress

102. The Defendant engaged in extreme and outrageous conduct, the torture of Mr. Schulte in a concentration camp through indefinite solitary confinement, sleep deprivation, starvation, extreme cold, constant blasting speakers, and other arbitrary tortures that caused injury to Mr. Schulte including physical and emotional, ~~death through both~~

103. Some Defendants engaged in this torture intentionally and deliberately while others only negligently.

104. The BOP employees were acting within the scope of their employment.

105. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

## B. Bivens

106. Mr. Schulte invokes the clearly established deliberate indifference Bivens action predicated on Carlson v. Green, 446 U.S. 14 (1980) — an Eighth Amendment cruel and unusual punishment suit against federal jailers for failure to provide adequate medical treatment.

107. Courts in this district continue to recognize a plaintiff's challenge to his "inadequate medical treatment" that rises to the level of an "Eighth Amendment deliberate indifference claim" as sufficient to invoke a Bivens remedy even after Abbasi and Egbert. See Mendoza v. Edge, 2022 WL 3097377, at *5 (EDNY July 13, 2022).

### 1. TENTH: Damages for deliberate indifference to serious medical need

108. Mr. Schulte hereby realleges and incorporates by reference paragraphs 94-100.

109. Mr. Schulte suffered a mental health emergency due to the torture imposed by Defendants; his condition was sufficiently serious that may cause death, degeneration, or extreme pain; and it was clear from his symptoms that he suffered from anxiety, depression, self-harm and suicidal ideation, among others.

110. When the medical care provided by the State includes the provision of psychiatric services, the State "is held to the same duty of care as private individuals and institutions engaged in the same activity." Rattray v. New York, 223 A.D.2d 356, 636 N.Y.S.2d 43, 44 (App. Div. 1996) (quoting Schrempf v. State, 66 N.Y.2d 289, 487 N.E.2d 883, 886, 496 N.Y.S.2d 973 (N.Y. 1985))

111. "In the context of mental health needs, propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as 'sufficiently serious.'"

Young v. Choinsky, 15 F. Supp. 3d 194, 199 (D. Conn. 2014)(citing cases).

112. The MDC Chief Psychologist and Unknown Defendants were deliberately indifferent to Mr. Schulte's mental health crisis by increasing his torture instead of real treatment and release from the concentration camp which MDC Psychologists knew to be the cause of Mr. Schulte's crisis.

113. MDC psychologists were deliberately indifferent during the three incidents referenced herein from the fall through winter of 2022-23.

114. MDC psychologists and Unknown Defendants were likewise deliberately indifference throughout Mr. Schulte's internment in the MDC concentration camp by failing to intervene and stop the torture; instead, Defendants falsified Psychology Reports indicating that indefinite solitary confinement posed no serious mental health concerns in direct contradiction of Mr. Schulte's symptoms and the psychological research to the contrary.

115. All MDC psychologists who saw Mr. Schulte professionally were deliberately indifferent to his serious medical emergency.

116. MDC Psychologists demonstrated their guilty knowledge when they attempted to manipulate Mr. Schulte into saying the correct things so they could wash their hands of liability; they did not engage in treatment or ply their trade to help Mr. Schulte, but rather sought to shirk their duties and responsibilities through bad faith, malicious malpractice and deliberate indifference to a man suffering from torture.

## VIII. PRAYER FOR RELIEF

117. Award Mr. Schulte damages for the pain, suffering, losses, injuries, and other damages caused by Defendants.

118. Award Mr. Schulte costs, fees, expenses, and other disbursements associated with the prosecution of this complaint, and reasonable attorneys fees, pursuant to 28 U.S.C. § 2412.

119. Award punitive damages and any such other relief that this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

## IX. "THREE STRIKES" RULE

120. Plaintiff has never had any actions dismissed pursuant to the "three strikes" rule of the PLRA.

## X. PREVIOUS SIMILAR ACTION

121. As noted here in, Plaintiff filed a petition for writ of habeas corpus seeking relief from many of the same issues now separately raised as FTCA and Bivens actions. See Schulte v. Warden, MDC, 22-CV-766 (Komittee, J (EDNY)

## XI. CONSENT TO PROCEED BEFORE MAGISTRATE

122. Plaintiff consents pursuant to 28 U.S.C. § 636(c) to have a magistrate judge preside over the trial.

Dated: Brooklyn, New York
October 9, 2023

Respectfully Submitted,
Josh Schulte, pro se



L 324002
N, NY 11232

USPS

New Civil Rights Complaint
ATTN: Pro Se Intake Office
U.S. District Court EDNY
225, Cadman Plaza East
Brooklyn NY 11201

FREEDOM FREEDOM FREEDOM FREEDOM FREEDOM